UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BRENDA SCOBEY,

        Plaintiff,                             Hon. Ellen S. Carmody

v.

                                          Case No. 1:17-cv-987

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

_____/


## OPINION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. The parties have agreed to proceed in this Court for all further proceedings, including an order of final judgment. Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**.

## STANDARD OF REVIEW

        The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal

standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984). As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 40 years of age on her alleged disability onset date. (PageID.166). She successfully completed high school and worked previously as a government auditor. (PageID.51-52). Plaintiff applied for benefits on April 22, 2014, alleging that she had been disabled since February 8, 2013, due to polymyositis, fibromyalgia, depression, and anxiety. (PageID.166-72, 191). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (PageID.86-164).

On June 10, 2016, Plaintiff appeared before ALJ Donna Grit with testimony being offered by Plaintiff and a vocational expert. (PageID.60-84). In a written decision dated July 27, 2016, the ALJ determined that Plaintiff was not disabled. (PageID.36-53). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (PageID.26-30). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1] If the Commissioner can

---

[1]  1.   An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b), 416.920(b));

2.   An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. §§ 404.1520(c), 416.920(c));

3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors. (20 C.F.R. §§ 404.1520(d), 416.920(d));

4.   If an individual is capable of performing her past relevant work, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e), 416.920(e));

make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) obesity; (2) fibromyalgia; (3) bilateral carpal tunnel syndrome; (4) status-post cervical fusion; and (5) migraines, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (PageID.38-42).

---

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f), 416.920(f)).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform sedentary work subject to the following limitations: (1) she can lift/carry 10 pounds occasionally and less than 10 pounds frequently; (2) during an 8-hour workday, she can sit and stand/walk for 6 hours each; (3) she cannot climb ladders, ropes, or scaffolds, but she can occasionally climb ramps and stairs; (4) she can occasionally balance, stoop, kneel, crouch, crawl, and reach bilaterally overhead; (5) she is limited to frequent bilateral handling and fingering; and (6) she must avoid more than occasional exposure to extremes of heat and cold, vibration, the use of vibratory tools, dangerous moving machinery, and unprotected heights. (PageID.42-43).

Based on the testimony of a vocational expert, the ALJ found that Plaintiff was able to perform her past relevant work as an auditor. (PageID.79-80). The vocational expert also testified that there existed approximately 165,000 jobs in the national economy which Plaintiff could perform consistent with her RFC. (PageID.79-80). The vocational expert additionally testified that if Plaintiff were further limited in that she required a sit-stand option and could stand/walk for only 2 hours daily, there still existed approximately 75,000 jobs in the national economy which Plaintiff could perform. (PageID.80-81). Accordingly, the ALJ concluded that Plaintiff was not entitled to disability benefits.

## I.       ALJ's Description of the Relevant Medical Evidence

The ALJ discussed the medical evidence at great length. Specifically, the ALJ stated as follows:

> The claimant presented to her primary care physician, Mary Pell, DO, on March 5, 2013, requesting that Dr. Pell complete short-term disability paperwork on the claimant's behalf (Ex. 17F/80-81). The note indicated that the claimant had last worked in February of 2013

*(Id.).* Interestingly, the claimant had an unremarkable physical examination, and no diagnosis was found *(Id.).*

The claimant has a history of migraines since her early 20's (Ex. 5F/14). When she was younger she had one or two bad headaches per year, with a number of more mild headaches throughout the year *(Id.).* However, as she got older her headaches worsened. By the time she was in her mid-30's the claimant reported that she had daily headaches *(Id.).* She began getting Botox injections in early 2012, and reported good reduction in headache symptoms with Botox therapy *(Id.).*

The claimant had a consultation with Michael Grof, DO, in March of 2013 for her complaints of numbness in her hands and feet (Ex. 1F/22). The claimant noted that her physical therapist had thought she might have fibromyalgia, but the claimant had not seen a rheumatologist at this time *(Id.).* On physical examination all the claimant's muscles had normal power; they were all very tender to palpation diffusely, with marked tenderness between the joints; but her coordination appeared normal (Ex. 1F/24). She also had sensory loss in the median nerve distribution of the hand on both sides; but she had normal sensation across the foot all the way with no dermatomal abnormalities, and no loss of sensory modalities over the feet *(Id.).* Finally, her reflexes were 2+/4 and symmetric although a little more sluggish with the triceps, but Dr. Grof though[t] this was likely due to the claimant's frame than anything else *(Id.).*

Dr. Grof diagnosed the claimant with migraine cephalgia without aura, being treated with Botox; muscle contraction cephalgia; diffuse myalgia and aithralgias, rule-out polymyositis; numbness in hands due to carpal tunnel syndrome; severe pain in legs with activity and weakness; and possible cervical spine abnormalities *(Id.).* The claimant was not taking any medications for pain management at that time, and Dr. Grof advised the claimant that she could take 800mg Ibuprofen twice daily (Ex. 1F/25).

Dr. Grof had the claimant get an EMG. The EMG showed a very slight to minimal median neuropathy at the wrist, on the right; and probably a remote, stable L5 radiculopathy on the right without evidence of active denervation; and very clear evidence of a diffuse proximal myopathic process (Ex. 1F/17-18). Dr. Grof noted that there was EMG evidence of carpal tunnel syndrome, but he noted that it was so mild that he did not expect that it would have given

the degree of symptomology that the claimant complained of (Ex. 1 F/16).

Dr. Grof also noted in April of 2013 that the claimant had compression of her cervical spine (Ex. 1F/15). But he indicated that it was not that especially severe, but it might warrant consideration for possible decompressive surgery *(Id.)*. MRI of the claimant's cervical spine showed posterior disc osteophyte complex of the C5-C6 level effacing the ventral thecal sac and mildly flattening the left ventral spinal cord; moderate right C5-C6 neural foraminal narrowing; and a small left thyroid nodule (Ex. 1F /27).

By August of 2013, Dr. Grof noted that the claimant had received four IV infusions of Methylprednisolone, and the claimant reported feeling that her legs had gotten "much stronger" (Ex. 1F/13). However, she complained that her arms felt weaker *(Id.)*. Dr. Grof indicated that did not make any sense in treating claimant's myopathy with steroids, and he found that the claimant had some radicular symptoms in her arms where there was numbness and tingling radiating from the neck down following a mostly C6 distribution on the left *(Id.)*. The claimant reported that her arms were weak when she would try to raise them over her head, but otherwise Dr. Grof did not feel that they seemed to be that weak (*Id.*).

Dr. Grof re-evaluated the claimant in October of 2013 for her complaints of pain and weakness in her hands and feet (Ex. 1F/7). The claimant continued to complain that she was losing feeling in her feet *(Id.)*. However, Dr. Grof noted that based on the claimant's reports and findings that day, that he thought the claimant's myopathic abnormality was markedly improved (Ex. 1F/8). He noted that her symptoms fit with a mild L5 radiculopathy but the majority of her pain seemed to be related more to swelling in her legs and neuropathic changes *(Id.)*. And he specifically noted that claimant's peroneal sensory nerve on both sides was totally normal, which suggested that a peripheral neuropathic cause was unlikely *(Id.)*.

The claimant's EMG showed a markedly improved myopathic process; and persistent L5 radiculopathy without evidence of significant active denervation, but no evidence of a polyneuropathy (Ex. 1F/10). Dr. Grof noted that the claimant had some "rather dramatic description of her complaints relative to the objective findings" (Ex. 1F/9). For instance, the claimant asserted that her hands frequently went completely numb and she could not feel

anything, but there was no evidence of her cervical spine causing that degree of widespread conduction block to cause that, and there was only the "minimalist" amount of peripheral nerve damage from carpal tunnel syndrome seen when she was tested *(Id.)*. She also described excmciating pain in her feet, with weakness, but Dr. Grof felt that it also appeared that the claimant tolerated this alleged pain fairly well *(Id.)*.

The claimant was scheduled to have surgery on her cervical spine in December of 2013. At her pre-operative examination the claimant had decreased range of motion in her cervical spine (Ex.21F/23). On December 26, 2013, the claimant had C5-C6 anterior cervical discectomy and fusion procedure (Ex. 2F/7). At her follow-up appointment in March of 2014 the claimant reported that her neck and arm pain were better (Ex. 10F/1). On physical examination the claimant had good motor strength *(id.)*. Dr. Winestone felt the claimant was doing well, and he cleared the claimant to slowly resume her usual activities *(Id.)*.

The claimant had a clinic visit and follow-up appointment and ultrasound for her thyroid in May of 2014 (Ex. 34F/1). She reported at that time that she was doing much better since her neck surgery, noting that she was doing "okay" these days *(Id.)*.

The claimant had an EMG in July of 2014. The EMG showed mild left median mononeuropathy at the wrist; and several sparse pockets of increased insertional and spontaneous activity within several muscles tested, which was consistent with an acute to subacute lower cervical radiculopathy, but other possibilities were noted to need consideration (Ex. 7F/17).

The claimant's pain clinic notes documented significant migraine symptom relief with Botox injections. Specifically, she reported between 50 to 90 percent symptom relief for up to 10 weeks (Ex. 6F, l IF, and 3 IF). The claimant testified that Botox injections did help her migraine symptoms a lot, reducing her symptoms from daily to approximately once or twice per week (Testimony at 8:49:24). However, her complaint was that the efficacy of the Botox injections typically wore off a few weeks short of her next injection *(Id.)*.

The claimant was evaluated at the University of Michigan rheumatology clinic in February of 2015 (Ex. 24F/66-68). She was diagnosed with fibromyalgia (Ex. 24F/68). She was advised at that time that a key aspect in fibromyalgia management was for the

claimant to appreciate that when her symptoms decreased in response to pharmacological therapy, she needed to correspondingly increase her functioning (Ex. 24F/69-70). It was noted that this increase in function and activity could result in continuing reduction in complaints of pain, fatigue, and other symptoms (Ex. 24F/70).

Finally, pain clinic treatment notes from February of 2016 indicated that the claimant had 85 percent relief in her migraine symptoms, for 10 weeks, with Botox injections (Ex. 31F/7). She described her *overall function* as "vastly improved" *(Id.).* On physical examination the claimant's muscle tone was normal, and her gait was non-antalgic, and unassisted (Ex. 31F/8).

(PageID.44-46).

## II.        The ALJ Properly Evaluated the Medical Opinion Evidence

Three of Plaintiff's care providers made observations or expressed opinions to which the ALJ afforded limited weight: (1) Dr. Michael Grof; (2) Dr. Mary Pell; and (3) Dr. Eric Kozfkay.   (PageID.48-51).   Plaintiff argues that she is entitled to relief on the ground that the ALJ "essentially rejected all of those opinions."   (ECF No. 13 at PageID.1991).   The Court notes that the relevant question is not whether the ALJ discounted these particular opinions, but instead whether the ALJ articulated good reasons for doing so.   Because the ALJ articulated good reasons, supported by substantial evidence, for discounting the opinions in question, this argument is rejected.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into her medical condition.   *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).   An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record."   *Gayheart v.*

9

*Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

A.    Dr. Grof

On October 13, 2013, Dr. Grof reported that Plaintiff "thinks she would be unable to do full time work because her muscles begin aching severely in her legs if she walks for more than 15 minutes or stands on them more than 15 minutes." (PageID.300). The doctor further noted that Plaintiff "admits, however, that she can sit for much longer periods of time if forced to do so." (PageID.300). Dr. Grof further observed:

> I cannot honestly state that I feel she is totally disabled. I definitely cannot state that she is unable to sit for greater than 30 minutes. She can use her arms and her hands well enough to type, write and perform typical office-based duties of a clerical or office assistant nature. She does have some neck pain, some other diffuse neuropathic pain in her limbs but it is not a disabling type of pain, by her own admission. I do think that a full eight hour day would be pretty hard for her to get through. I do feel that she has a neuromuscular condition that causes pain with muscular activity and that the more she do[es] with it, the worse the pain will get. Therefore, very limited repetitive physical activity would be recommended. However, she should be able to drive from one

11

appointment to another for work. She also should be able to sit and do light duty desk work for at least an hour at a time with a slight break and then return to the same thing.

(PageID.300).

On October 31, 2013, Dr. Grof supplemented his opinion with the following observations:

> if Ms. Scobey is required by her job to remain seated for a period longer than 45 minutes without being able to even stand up and stretch her legs, walk around or just stand still, then I would have to deem her completely disabled from that job because it would be expected that, in her condition, prolonged sitting in one position, longer than 45 minutes, will cause disabling pain. This is a subjective complaint but it is reasonable and not an unusual complaint in individuals such as Ms. Scobey. Though there is no objective neurological reason for this, the production of intense pain from prolonged pressure in certain positions without allowing replenishing revascularization through the natural use of body mechanic movement, could definitely produce pain that is intense enough to distract her mind from what she should be thinking about doing with her job.

(PageID.301).

In support of her decision to discount Dr. Grof's opinions and observations, the ALJ stated as follows:

> The opinions of Michael Grof, DO, are given limited weight, and not controlling weight. Dr. Grof initially indicated that he could not honestly state that the claimant was totally disabled (Ex 1F/5). And he did not feel he could state that she was unable to sit for greater than 30 minutes *(Id.)*. He felt she could use her arms and hands well enough to type, write, and perform typical office-based duties of a clerical or office assistant nature *(Id.)*. He noted that the claimant had some neck pain, and some other diffuse neuropathic pain in her limbs, but it was not a disabling type of pain, by the claimant's own admission *(Id.)*. He noted that a full eight-hour day would be hard for the claimant to get through, and he did feel the claimant had a neuromuscular condition that caused pain with muscular activity and the more she did with it, the worse the pain would get *(Id.)*. He therefore concluded that the claimant could perform very limited

12

repetitive physical activity; however, he felt she would be able to drive from one appointment to another for work; and she would be able to sit and do light duty desk work for at least an hour at a time with a slight break and then return to the same thing *(Id.)*. Dr. Grof explained that he discussed these physical opinions with the claimant, and she was pretty much in agreement *(Id.)*.

However, Dr. Grof later noted that he made some mistakes in his earlier assessment of the claimant (Ex. 1F/6). He opined that if the claimant was required to remain seated for more than 45 minutes without being able to stand up and stretch her legs, walk around, or just stand still, then he felt the claimant was completely disabled *(Id.)*. He explained that this conclusion was based on the claimant's subjective complaints, but he also felt that it was a reasonable conclusion. He explained that there was no objective neurological reason for the claimant's production of intense pain, but that prolonged pressure in certain positions without allowing replenishing revascularization through the natural use of body mechanic movement could produce pain that was intense enough to distract the claimant's mind from what she needed to think about to do her job *(Id.)*. He felt that was disabling *(Id.)*.

Dr. Grof s opinions are given limited weight and not controlling weight because they were internally inconsistent, as well as inconsistent with the record. Dr. Grof s opinions are internally inconsistent because he completely changed his opinions concerning the claimant's functional abilities in his two assessments, despite indicating in the first assessment that he specifically discussed his opinions with the claimant, aud she expressed agreement with his conclusions. Dr. Grof also focused on the claimant's past work, but that is not the only issue of relevance in the sequential evaluation process. Dr. Grof noted that there was no objective neurological reason for the claimant's complaints of pain, and explained that his conclusion that the claimant was disabled was based on her subjective complaints, and his explanation concerning movement to alleviate some of her pain. Dr. Grofs reliance on the claimant's subjective complaints is misplaced. Especially considering that the many mental status examinations noted throughout the treatment notes indicated that the claimant did not have significantly limited concentration. Finally, Dr. Grof s opinion that the claimant was disabled was an opinion on an issue reserved to the Commissioner, and involved vocational considerations for which he is not an expert. Therefore, for all these reasons, the opinions of Dr. Grof are given limited weight, and not controlling weight.

(PageID.48-49).

The ALJ's rationale for discounting Dr. Grof's opinion is clearly stated, consistent with the administrative record, and supported by substantial evidence. In support of her argument, Plaintiff has failed to identify any medical evidence which undercuts the ALJ's analysis. Instead, Plaintiff merely wants this Court to reweigh the evidence that was presented to the ALJ. This is not a proper basis for relief. *See, e.g., Reynolds v. Commissioner of Social Security*, 424 Fed. Appx. 411, 414 (6th Cir., Apr. 1, 2011) (the court "reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in the evidence, decide questions of credibility, or substitute its judgment for that of the ALJ").

The Court further notes that any error regarding the assessment of Dr. Grof's opinion is harmless. The vocational expert testified that if Plaintiff also required a sit-stand option and could stand/walk for only two hours daily there still existed a significant number of jobs which she could perform. Dr. Grof's opinion is not inconsistent with this particular hypothetical which undermines Plaintiff's claim of complete disability. Because any error in this regard is harmless, relief is not appropriate. *See Shinseki v. Sanders*, 556 U.S. 396, 407 (2009) (recognizing that the harmless error doctrine is intended to prevent reviewing courts from becoming "impregnable citadels of technicality"); *Heston v. Commissioner of Social Security*, 245 F.3d 528, 535-36 (6th Cir. 2001) (recognizing that remand to correct an error committed by the ALJ unnecessary where such error was harmless); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("no principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"); *Berryhill v. Shalala*, 1993 WL 361792 at *7 (6th Cir., Sep. 16, 1993) ("the court will remand the case to the

agency for further consideration only if 'the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture...'").

B.     Dr. Pell

On March 9, 2013, Dr. Pell completed a brief form report in which she stated that Plaintiff could perform "no work." (PageID.1014). The doctor also reported that Plaintiff should "be able to return to work in [her] occupation" on April 15, 2013. (PageID.1014). In response, Plaintiff wrote to Dr. Pell requesting that she complete the form again. (PageID.1120). Plaintiff detailed for Dr. Pell several of her medical complaints and stated, "the only way to preserve my job is to say I am currently disabled." (PageID.1120). On April 22, 2013, Dr. Pell completed another brief form in which she reported that Plaintiff was unable to perform her then-current job because Plaintiff "can't sit or stand without pain." (PageID.1121). Dr. Pell further reported that Plaintiff would be disabled from her then-current job through February 28, 2014. (PageID.1121).

In support of her decision to discount Dr. Pell's opinions, the ALJ stated:

> The opinions of Mary Pell, DO, are given little weight and not controlling weight. The claimant wrote a letter to Dr. Pell in April of 2013 indicating that she was scheduled for a biopsy to see if she had muscle disease; and neck surgery for her symptoms of numbness in her arms and hands (Ex. 19F/5). Additionally, she noted that an MRI had shown a growth on her thyroid, which the claimant felt might need removal *(Id.)*. She went on to explain that she needed some time to take care of these things, and the only way for her to preserve her job was for Dr. Pell to "say I am currently disabled["] *(Id.)*. Dr. Pell subsequently completed a form on the claimant's behalf (Ex. 19F/6). She opined that the claimant was unable to sit or stand comfortably, or without pain, and that her symptoms had been present from February 28, 2013 through the present, which at that time was April of 2013 *(Id.)*. The opinions of

> Dr. Pell are given little weight, and not controlling weight, as her opinions are merely a recitation of the claimant's symptoms and subjective complaints. Furthermore, the note that the claimant could not sit or stand without pain is not helpful in establishing the claimant's maximum residual functional abilities. Therefore, the opinions of Dr. Pell are given no weight.

(PageID.49-50).

The ALJ's rationale for discounting Dr. Pell's opinion is clearly stated, consistent with the administrative record, and supported by substantial evidence. The Court notes that another legitimate reason for discounting Dr. Pell's opinion is that the doctor's opinion was limited to Plaintiff's ability to perform her then-current position rather than identifying, more generally, Plaintiff's ability to perform work-related activities. The Court again notes that Plaintiff has failed to identify any medical evidence which is contrary to the ALJ's analysis. Instead, Plaintiff merely wants this Court to reweigh the evidence that was presented to the ALJ, which as noted above is not appropriate.

### C.      Dr. Kozfkay

On May 31, 2016, the doctor provided a sworn statement in which offered several vague statements regarding Plaintiff's ability to perform work-related activities. (PageID.1960-64).[2]  For example, the doctor stated "due to the severity of the pain and it affecting her whole body, as well as her issues with not being rested and cognitive slowing, any laborious position or any position that would cause undue mental stress would affect her ability to maintain full-time employment."  (PageID.1962).  With respect to specific functional limitations, Dr. Kozfkay reported that during an 8-hour day Plaintiff could stand/walk no more than one hour.

---

[2] This document is contained in Exhibit 39.  Exhibit 40 contains a signed, but more difficult to read, version of this same document.

(PageID.1963). The doctor also reported that Plaintiff's pain would interfere with her ability to perform even simple tasks approximately 50-75 percent of the workday. (PageID.1964).

In support of her decision to discount Dr. Kozfkay's opinions, the ALJ stated as follows:

> The opinions of Dr. Kozfkay noted in Exhibits 39F and 40F are given little weight, and not controlling weight. Dr. Kozfkay explained that he felt the claimant was disabled at that time, as well as before, due to her severe pain affecting her whole body, and her issues with not being well rested, being cognitively slow, and the effects of mental stress on the claimant (Ex. 39F and 40F). He felt that the claimant could not perform sedentary work because she had an impaired sleep cycle, which affected her cognitive functioning and decision making skills (*Id.*). And he felt that the claimant could not perform any laborious position or any position that could cause her undue stress, because this would affect her ability to maintain full-time employment *(Id.)*. He opined that the claimant could probably occasionally lift and carry up to 10 pounds; her grips strength demonstrated at the independent medical examination was below normal; she could stand and/or walk for one hour in an eight-hour workday; her ability to lift, carry, stand, and walk was limited due to her severe pain; she would require a sit/stand option; she would need the option to sit or stand every five to 10 minutes; she would be off task 50 to 75 percent of the workday; and her limitations had been present since February of 2013 *(Id.)*.

> Dr. Kozfkay opined that the claimant was disabled due to her severe pain. However, our regulations establish that pain cannot be the sole basis for limitations, HALLEX II-4-1-3. Additionally, Dr. Kozfkay's references to the claimant's cognitive functioning were directly contradicted by the many mental status examinations noted throughout the record. The statement that "any position" would cause the claimant undue mental stress, which would in turn affect her ability to work was not supported by the record. Dr. Kozfkay suggests that all work would be too mentally stressful for the claimant. However, the claimant does not have a severe mental impairment, and as noted throughout this decision, she had consistently normal or near normal mental status examinations performed by several different providers, in a variety of different situations. Dr. Kozfkay went on to opine that the claimant would be off task 50 to 75 percent of the workday. However, it is important to note that in Dr. Kozfkay's own treatment notes he consistently found

17

the claimant had normal muscle tone; and non-antalgic, unassisted gait (Ex. 6F, 11F, and 31F). Furthermore, other than complaints of anxiety, stress, depression, and problems sleeping, neither he nor his staff ever noted that the claimant had significant attention or concentration issues *(Id.)*. Finally, Dr. Kozfkay opined that the claimant would need to alternate between sitting and standing every five to 10 minutes. However, this would result in the claimant standing or walking more than one hour in an eight-hour workday, which was the maximum amount of time he opined the claimant could stand or walk. Therefore, his opinions were not only inconsistent with the record; they were internally inconsistent and mathematically inaccurate. Therefore, the opinions of Dr. Kozfkay noted in Exhibits 39F and 40F are given little weight, and not controlling weight.

(PageID.50-51).

The ALJ's rationale for discounting Dr. Kozfkay's opinion is clearly stated, consistent with the administrative record, and supported by substantial evidence. The Court again notes that Plaintiff has failed to identify any medical evidence which undermines the ALJ's analysis. Instead, Plaintiff merely wants this Court to reweigh the evidence that was presented to the ALJ, which as noted above is not appropriate.

Plaintiff also incorrectly argues that because Plaintiff was diagnosed with fibromyalgia, the opinions of her treating physicians "deserve even more credence." (ECF No. 13 at PageID.1991). In support of this argument, Plaintiff cites to *Rogers v. Commissioner of Social Security*, 486 F.3d 234 (6th Cir. 2007). In *Rogers*, the Sixth Circuit faulted an ALJ for failing to articulate good reasons, supported by substantial evidence, for discounting the opinion of a treating physician of a claimant who had been diagnosed with fibromyalgia. *Id.* at 237. However, the Sixth Circuit's decision was not based upon a failure by the ALJ to afford "more credence" to the opinions in question. Instead, the court merely reiterated the well-known treating physician rule and concluded that the ALJ in that case failed to comply with such. *Id.* 242-46.

18

The *Rogers* court neither stated nor suggested that ALJs or courts are obligated to afford "even more credence" to a treating physician's opinion on the subject of fibromyalgia. In sum, *Rogers* merely reiterates that ALJ's must comply with the treating physician rule when evaluating the opinions of a treating physician. Because the ALJ complied with the treating physician rule in this instance, this argument is rejected.

### III.    The ALJ Properly Considered Plaintiff's Subjective Allegations

At the administrative hearing, Plaintiff testified that she is far more limited than the ALJ concluded. For example, Plaintiff testified that she is unable to "even hold the vacuum cleaner" or "lift something off the stove." (PageID.75-76). Plaintiff reported that she is unable to work because she "can't focus" and experiences work-preclusive pain. (PageID.78). Plaintiff reported, however, that she continues to drive, read, and perform crossword puzzles. (PageID.76). The ALJ discounted Plaintiff's subjective allegations on the ground that such "are not entirely consistent with the record." (PageID.46-47). Plaintiff argues that she is entitled to relief because, "[o]nce again, this ALJ's credibility determination was insufficient as a matter of law." (ECF No. 13 at PageID.1993-94).

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added); *see also*, *Grecol v. Halter*, 46 Fed. Appx. 773, 775 (6th Cir., Aug. 29, 2002) (same). As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)) *Hash v. Commissioner of Social*

*Security*, 309 Fed. Appx. 981, 989 (6th Cir., Feb. 10, 2009).   Instead, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard.

First, it must be determined whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's alleged symptoms.   *See* Titles II and XVI: Evaluation of Symptoms in Disability Claims, Social Security Ruling 16-3p, 2016 WL 1119029 at *3-4 (S.S.A., Mar. 16, 2016).   Next, the intensity and persistence of the claimant's symptoms are evaluated to determine the extent to which such limit his ability to perform work-related activities.   *Id.* at *4-9.[3]

As the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms."   *Workman v. Commissioner of Social Security*, 105 Fed. Appx. 794, 801 (6th Cir., July 29, 2004).   However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record."   *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference."   *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility

---

[3] Social Security Ruling 16-3p rescinded Social Security Ruling 96-7p.   *Id.* at *1.   However, the adoption of this new Social Security Ruling did not alter the analysis for evaluating a claimant's subjective statements.   Instead, as the Social Security Administration stated, it was simply "eliminating the use of the term 'credibility' [so as to] clarify that that subjective symptom evaluation is not an examination of an individual's character."   *Ibid.*   As courts recognize, aside from this linguistic clarification, "[t]he analysis under SSR 16-3p otherwise is identical to that performed under SSR 96-7p."   *Young v. Berryhill*, 2018 WL 1914732 at *6 (W.D. Ky., Apr. 23, 2018).

of the witnesses and weigh and evaluate their testimony"). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987). As the Sixth Circuit has stated, "[w]e have held that an administrative law judge's credibility findings are virtually unchallengeable." *Ritchie v. Commissioner of Social Security*, 540 Fed. Appx. 508, 511 (6th Cir., Oct. 4, 2013) (citation omitted).

Nevertheless, the ALJ is not permitted to assess a claimant's subjective allegations based upon "an intangible or intuitive notion about an individual's credibility." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 247 (6th Cir. 2007). Instead, the ALJ's rationale for discrediting a claimant's testimony "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248. Accordingly, "blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence." *Id.*

In support of her decision to discount Plaintiff's subjective allegations, the ALJ stated as follows:

> I first note that the claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the record. The claimant alleges disabling impairments, but most of the claimant's strength tests noted throughout the record were good. Her carpal tunnel syndrome has been described as mild and she told the independent medical examiner that she did not wear splints (Ex. 36F/2). Her L5 radiculopathy has been noted as chronic, but it was also noted to be

21

stable, and there was no evidence of lower extremity weakness on physical examinations. Despite the claimant's complaints of fibromyalgia, she had good muscle tone on physical examinations. And she reported improvement in her neck symptoms following her discectomy and fusion procedure. Finally, the claimant has reported significant benefit from her Botox treatments for her migraines. She has not only reported symptom reduction, but overall functional improvement due to her treatment at the pain clinic (Ex. 31F/7). Therefore, the claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the record.

The claimant also reported to the independent medical examiner that she used a walker and needed help arising, and she used a number of aids and devices around the home, including a bathtub seat and bar, long handled appliances, a jar opener, and a device for picking things up from the floor (Ex. 36F/6). However, her pain clinic treatment notes consistently noted that the claimant had a non-antalgic, bilaterally unassisted gait (Ex. 6F, 11F, and 31F). And the independent medical examiner noted that despite the claimant's complaints of "screaming pain" in certain areas, no pain behaviors were observed during the examination, even with palpation of the areas in question that the claimant claimed elicited extreme pain reactions (Ex. 36F/7).

These factors are inconsistent with the claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms.

(PageID.46-47).

The ALJ's rationale for discounting Plaintiff's testimony is supported by substantial evidence and consistent with the legal standard articulated above. The Court is not persuaded by Plaintiff's argument that the Court should re-weigh the evidence which was presented to the ALJ. Accordingly, this argument is rejected.

**IV.          The ALJ Properly Evaluated Plaintiff's Impairments**

Plaintiff argues that she is entitled to relief because the ALJ failed to find that her "struggles with irritable bowel syndrome and with frequent urinary symptoms" constitute severe

impairments. (ECF No. 13 at PageID.1994). At step two of the sequential disability analysis articulated above, the ALJ must determine whether the claimant suffers from a severe impairment. The Sixth Circuit has held that where the ALJ finds the presence of a severe impairment at step two and proceeds to continue through the remaining steps of the analysis, the alleged failure to identify as severe some other impairment constitutes harmless error so long as the ALJ considered the entire medical record in rendering her decision. *See, e.g., Kirkland v. Commissioner of Social Security*, 528 Fed. Appx. 425, 427 (6th Cir., May 22, 2013) ("so long as the ALJ considers all the individual's impairments, the failure to find additional severe impairments. . .does not constitute reversible error"); *Winn v. Commissioner of Social Security*, 615 Fed. Appx. 315, 326 (6th Cir., June 15, 2015) (same).

Here, the ALJ determined that Plaintiff suffered from severe impairments at step two of the sequential analysis and continued with the remaining steps thereof, considering in detail the medical evidence of record. The record does not suggest that Plaintiff's bowel or urinary issues impose on her any limitations which are inconsistent with her RFC. Thus, even if it is assumed that the ALJ erred in failing to find that these conditions constitute severe impairments, such does not call into question the substantiality of the evidence supporting the ALJ's decision. This argument is, therefore, rejected.

## V.       The ALJ Properly Relied on the Testimony of a Vocational Expert

Plaintiff argues that the ALJ's finding at Step V of the sequential evaluation process is unsupported by the evidence. While the ALJ may satisfy her burden through the use of hypothetical questions posed to a vocational expert, such questions must accurately portray Plaintiff's physical and mental impairments. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150

(6th Cir. 1996). The hypothetical question which the ALJ posed to the vocational expert simply asked whether there existed jobs which an individual could perform consistent with Plaintiff's RFC, to which the vocational expert indicated that there existed a significant number of such jobs. The ALJ's RFC determination is supported by substantial evidence and there was nothing improper or incomplete about the hypothetical questions the ALJ posed to the vocational expert. The Court concludes, therefore, that the ALJ properly relied upon the vocational expert's testimony.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**. A judgment consistent with this opinion will enter.


Dated: September 28, 2018                      /s/ Ellen S. Carmody
                                              ELLEN S. CARMODY
                                              United States Magistrate Judge